[883 NE2d 996, 854 NYS2d 89]

In the Matter of The American Committee for the Weizmann Institute of Science, Appellant, v Jennifer Dunn, Individually and as Executor of Doris Weingarten, Deceased, et al., Respondents.

Argued January 8, 2008; decided February 14, 2008

## POINTS OF COUNSEL

*Orans, Elsen & Lupert LLP,* New York City (*Robert L. Plotz, Leslie A. Lupert* and *Nicholas G. Arons* of counsel), for appellant. I. The charity made a sufficient showing to obtain SCPA 1404 discovery on its undue influence claim. (*Matter of Abrial,* 286 App Div 916; *Matter of Callahan,* 273 App Div 884; *Matter*

*of Greene,* 240 AD2d 745; *Matter of Walther,* 6 NY2d 49; *Matter of Arnold,* 78 AD2d 753; *Matter of Kaufmann,* 20 AD2d 464; *Matter of Saterlee,* 281 App Div 251; *Matter of Paneck,* 237 AD2d 82; *Matter of Itta,* 225 AD2d 548; *Matter of Loverme,* 27 AD3d 747.) II. The American Committee for the Weizmann Institute of Science is entitled to SCPA 1404 discovery even under the reasonable probability of success standard. (*Matter of Bacon,* 169 Misc 2d 858; *Matter of Walther,* 6 NY2d 49; *Matter of Paneck,* 237 AD2d 82; *Matter of Itta,* 225 AD2d 548; *Matter of Bobst,* 165 Misc 2d 776; *Matter of Loverme,* 27 AD3d 747; *Matter of Musso,* 227 AD2d 404; *Rollwagen v Rollwagen,* 63 NY 504; *Morrison-Knudsen Constr. Co. v Director, Office of Workers' Compensation Programs,* 461 US 624; *Matter of Cregan,* 275 NY 337.) III. The petition sufficiently alleged a contract to make a gift to the American Committee for Weizmann Institute of Science. (*Hamlin v Stevens,* 177 NY 39; *Matter of Lubins,* 250 AD2d 850; *Matter of Camac,* 2 Misc 3d 894; *Mallad Constr. Corp. v County Fed. Sav. & Loan Assn.,* 32 NY2d 285; *Matter of Urdang,* 304 AD2d 586; *Crabtree v Elizabeth Arden Sales Corp.,* 305 NY 48; *Bruce Realty Co. of Fla. v Berger,* 327 F Supp 507; *Matter of Drogin,* 144 Misc 2d 747; *Matter of Field,* 11 Misc 2d 427; *Morris Cohon & Co. v Russell,* 23 NY2d 569.)

*Hofheimer, Gartlir & Gross, LLP,* New York City (*David L. Birch* of counsel), for respondents. I. The American Committee for Weizmann Institute of Science was not entitled to citation advising it of the application to probate the decedent's will and therefore had no statutory right to take depositions pursuant to SCPA 1404 (4). (*Matter of Brinkmann,* 21 NY2d 804; *Matter of Minasian,* 149 AD2d 511; *Matter of Abrial,* 286 App Div 916; *Matter of Eisenlohr,* 153 Misc 130; *Matter of Bray,* 146 Misc 415; *Wasmuth v Allen,* 14 NY2d 391, 379 US 11; *Schulman v People,* 10 NY2d 249; *Uberman v Lasner,* 55 Misc 2d 1027.) II. The American Committee for Weizmann Institute of Science was required to demonstrate a substantial basis for contesting the decedent's will and a reasonable probability of its success before the probate decree can be set aside. (*Matter of Musso,* 227 AD2d 404; *Matter of Baldwin,* 3 AD2d 635; *Matter of Frutiger,* 29 NY2d 143; *Matter of Leslie,* 175 App Div 108; *Matter of Westberg,* 254 App Div 320, 279 NY 316, 283 NY 589; *Matter of Callahan,* 273 App Div 884; *Matter of Sandow,* 25 Misc 2d 356, 13 AD2d 451, 912; *Matter of Wang,* 5 AD3d 785; *Matter of Greene,* 240 AD2d 745; *Matter of Abrial,* 286 App Div 916.) III. The courts below correctly determined that appellant had not met its burden to allege or demonstrate a substantial basis for and a

reasonable probability of success to contest decedent's will on the basis of undue influence. (*Matter of Kindberg,* 207 NY 220; *Matter of Spinello,* 291 AD2d 406; *Matter of Clapper,* 279 AD2d 730; *Matter of Posner,* 160 AD2d 943, 76 NY2d 710, 77 NY2d 940; *Matter of Walther,* 6 NY2d 49; *Children's Aid Socy. of City of N.Y. v Loveridge,* 70 NY 387; *Smith v Keller,* 205 NY 39; *Matter of Schillinger,* 258 NY 186; *Matter of Coniglio,* 242 AD2d 901; *Matter of Evanchuk,* 145 AD2d 559.) IV. Appellant did not properly allege a contract to make a bequest nor did appellant demonstrate a substantial basis for contesting the will on this basis and a reasonable probability of its success. (*Blackmon v Estate of Battcock,* 78 NY2d 735, 79 NY2d 915; *Morris Cohon & Co. v Russell,* 23 NY2d 569; *Rubin v Irving Trust Co.,* 305 NY 288; *Oursler v Armstrong,* 10 NY2d 385; *Woodmere Academy v Steinberg,* 41 NY2d 746; *Lefkowitz v Lebensfeld,* 51 NY2d 442; *Rubenstein v Mueller,* 19 NY2d 228; *Edson v Parsons,* 155 NY 555; *Cobble Hill Nursing Home v Henry & Warren Corp.,* 74 NY2d 475; *Matter of Weisman,* 251 AD2d 112, 92 NY2d 920.)

*Andrew M. Cuomo, Attorney General,* New York City (*Richard Dearing, Barbara D. Underwood, Michelle Aronowitz* and *Carl Distefano* of counsel), in his statutory capacity under EPTL article 8. I. A petition to reopen probate should not be dismissed without any opportunity for preliminary discovery unless the petition, liberally construed, fails to set forth any indicia of a possible ground for objection to probate. (*Matter of Orlowski,* 281 AD2d 422; *Matter of Wharton,* 114 Misc 2d 1017; *Matter of Musso,* 227 AD2d 404; *Matter of Carney,* 31 Misc 2d 676; *Matter of Frutiger,* 29 NY2d 143; *Matter of Baldwin,* 3 AD2d 635; *Bazak Intl. Corp. v Mast Indus.,* 73 NY2d 113; *CPC Intl. v McKesson Corp.,* 70 NY2d 268; *Udoff v Zipf,* 44 NY2d 117; *Jered Contr. Corp. v New York City Tr. Auth.,* 22 NY2d 187.) II. The American Committee for Weizmann Institute of Science's petition sets forth strong indicia of undue influence that easily satisfy the standard on a motion to dismiss. (*Rollwagen v Rollwagen,* 63 NY 504; *Children's Aid Socy. of City of N.Y. v Loveridge,* 70 NY 387; *Matter of Henderson,* 80 NY2d 388; *Matter of Walther,* 6 NY2d 49; *Matter of Itta,* 225 AD2d 548; *Matter of Bacon,* 169 Misc 2d 858; *Matter of Jackson,* 134 Misc 750; *Matter of Ferrara,* 7 NY3d 244.) III. The lower courts' approach would virtually guarantee that charities will be unable to obtain relief in cases where relatives exercise undue influence to override a decedent's charitable intentions. (*Matter of Ferrara,* 7 NY3d 244; *Woodmere Academy v Steinberg,* 41 NY2d 746; *Saint Joseph's Hosp. v Bennett,* 281 NY 115.) IV. The First Depart-

ment erroneously dismissed the American Committee for Weizmann Institute of Science's contract claim for failure to satisfy the statute of frauds. (*Marks v Cowdin*, 226 NY 138; *Henry L. Fox Co. v Kaufman Org.*, 74 NY2d 136; *Rubin v Irving Trust Co.*, 305 NY 288.)

## OPINION OF THE COURT

CIPARICK, J.

This appeal requires us to determine the standard applicable to a petition to vacate a probate decree brought by a nonparty to an initial probate proceeding and based upon "newly-discovered evidence," which allegedly demonstrates that a probated will was procured through the exercise of undue influence upon a testator. We are also asked to consider whether correspondence between decedent, Doris Dunn Weingarten, and petitioner, a charitable organization engaged in fundraising for scientific research, constitutes a contract to bequeath the sale proceeds of decedent's cooperative apartment to petitioner that is sufficient to satisfy the statute of frauds applicable to testamentary bequests (EPTL 13-2.1).

We conclude, as to the second issue, that the correspondence presented here fails to satisfy the EPTL requirements because it does not indisputably demonstrate decedent's intent to renounce her right to freely execute a subsequent will during her lifetime. As to the primary issue here, we hold that a party seeking to vacate a probate decree based upon the alleged exercise of undue influence must establish a substantial basis for its challenge to the probated will and a reasonable probability of success on the merits of its claim. Because petitioner failed to substantiate its undue influence claim with competent evidence of decedent's longstanding, specific testamentary intent to benefit the charity in her will, we conclude, as a matter of law, that the Surrogate's Court did not abuse its discretion in refusing to vacate its probate decree.

## I.

Decedent died on January 16, 2004. Five days before her death, she executed a will that named her brother, Irving Dunn, executor and left her duplex cooperative apartment to her niece Jennifer Dunn, Irving's daughter.[1] The co-op, which is located on Manhattan's Riverside Drive, was valued at approximately

---

1. Prior to this appeal, Irving Dunn died. Petitioner has substituted Renee Dunn, the executor of his estate, as a respondent in his stead.

$1 million at the time. The January 11 will also left decedent's personal effects to Irving Dunn and her residuary estate to two of her nephews and two of her nieces, in equal shares.

On January 26, Irving Dunn filed a petition with Surrogate's Court, seeking probate of the January 11 will. On February 9, the Surrogate granted that petition on the basis of a January 12 affidavit submitted by Edward S. Schlesinger, an attorney who supervised and witnessed decedent's execution of the will, and another witness, Sarah J. Schlesinger.[2] In that affidavit both witnesses swore that the decedent "was under no duress or restraint[ ] and was in all respects competent to make a Will" when she executed the January 11 will.

Petitioner, a New York not-for-profit corporation engaged in the solicitation of philanthropic donations on behalf of the Weizmann Institute of Science, a center for scientific research and graduate study located in Israel, did not receive—nor was it entitled to—notice of either the January 26 probate petition or the February 9 decree. On October 5—nearly eight months later—petitioner filed a verified petition, signed by its executive vice-president, Martin Kraar, seeking vacatur of the February 9 decree pursuant to CPLR 5015, return of the co-op (or its proceeds) pursuant to SCPA 2105 and the opportunity to obtain discovery regarding decedent's execution of the January 11 will pursuant to SCPA 1404 (4). Petitioner alleged it was entitled to that relief because it had "newly-discovered evidence" that the January 11 will was executed due to Irving and/or Jennifer Dunn's exercise of undue influence over decedent and because it had a contract with decedent under which she was obligated to leave it the co-op's sale proceeds.

In its verified petition, petitioner alleged that decedent had "long intended to make a sizeable donation to Weizmann." In support of this claim, petitioner alleged that, in 1981, decedent and her husband, Aaron Weingarten, "executed reciprocal wills leaving their respective residuary estates to Weizmann should one predecease the other." Decedent's husband died in 1992. The verified petition claims that, after his death, decedent "decided to change the residuary bequest to [petitioner] to a

---

**2.** Although not alleged in its petition, before this Court petitioner asserted that Irving Dunn procured Mr. Schlesinger to draft the will. In addition, the Attorney General argued that Ms. Schlesinger is both Mr. Dunn's "next-door neighbor" and Mr. Schlesinger's daughter.

bequest of the proceeds of the sale of her duplex apartment."[3] Neither the 1981 will nor any subsequent will were annexed to the petition. But petitioner did annex two 1994 letters that, it contended, constituted a "binding contract" to leave it the co-op's sale proceeds.

In the first letter, dated September 12, 1994, Richard Brill, whom petitioner claims was then acting as decedent's attorney, wrote:

> "I am drawing a will for my client, Doris Weingarten, of New York City. In the will she is making a very substantial bequest to the Weizmann Institute, contingent upon [it] agreeing to four conditions . . . (a) to establish a fund, to be called, in perpetuity, The Doris and Aaron Weingarten Fund (b) to place in the fund the entire sum paid to the Institute by the executor of the will, to constitute the principal of the fund (c) to invest the principal in interest-bearing investments, and (d) to expend annually the entire interest earned for scientific research."

Four days later, petitioner's then executive vice-president, Bernard Samers, responded, "acknowledg[ing] that [petitioner] will agree to the four conditions set forth in your letter."

Petitioner alleged that decedent repeatedly "reconfirmed" the purported 1994 contract "up to several months before her death." It claimed that on September 19, 1994, Judy Feig, its then director of planned giving, wrote to decedent to express petitioner's gratitude for decedent's generosity and to invite her to a "Gala Celebration," tickets to which ordinarily cost $1,000 each, at petitioner's expense. In addition, petitioner asserted that in September 1996, decedent called Ms. Feig's successor, Steven Meyers, to confirm that the "very substantial bequest" mentioned in Mr. Brill's 1994 letter referred to her co-op's sale proceeds. During that call, petitioner also alleges that decedent requested two free tickets to the 1996 Gala Celebration. In response to that request, petitioner claims that one of its employees, Tina Begleiter, met with decedent on October 2, 1996 at the co-op. After decedent purportedly reconfirmed her agreement to bequeath the co-op's sale proceeds to petitioner, Ms. Begleiter

---

3. Decedent and her husband had no children.

allegedly gave decedent the free Gala tickets that she previously requested.[4]

According to petitioner, Ms. Begleiter regularly met with decedent until her passing. During their conversations, petitioner alleges that decedent repeatedly reaffirmed that petitioner would receive the co-op sale proceeds upon her death. Indeed, petitioner claims that in February 2000, decedent called Ms. Begleiter to inform her that a realtor had appraised the co-op at $1.4 million. Based on decedent's representations, petitioner asserted that for many years it included the co-op's proceeds in its list of "known expectancies," which are used for purposes of financial and strategic planning. In addition, petitioner claims that, in consideration of decedent's anticipated bequest, it designated decedent a member of its Honor Society, which entitled her to a special pin and to attend a special event as well as special mailings and invitations to Weizmann Institute events.

At various times, over the course of their more-than 20-year relationship, petitioner alleges that decedent discussed with certain of its officials the possibility of "amending" the purported 1994 contract to transfer title to her co-op to petitioner while retaining a life estate for herself. Petitioner further claimed that a February 4, 1998 letter from decedent reconfirmed the 1994 contract to bequeath the co-op and discussed the life-estate option.

Turning to its allegations of undue influence, petitioner asserted that its longstanding reliance upon the 1994 contract was dashed in January 2004, when following a December 2003 diagnosis of terminal gall bladder cancer, decedent moved to Irving Dunn's apartment to receive hospice care during what would be her final illness. Petitioner claimed that when she executed the January 11 will, decedent "was in a severely weakened condition" and that Irving and/or Jennifer Dunn exerted undue influence over her. To support this allegation, petitioner alleged that "[t]he January 11, 2004 Will is an unexplained departure from [decedent's] previously expressed testamentary plan and repeatedly stated intention, over a period of more than 20 years, that she would make a substantial provision for Petitioner in her Will." Alternatively, petitioner claimed that it was entitled to the proceeds of the sale of the co-op based upon the "bind-

4. Petitioner also claims that decedent attended the 1997 through 2002 Galas at no cost and that on one occasion she brought Irving Dunn as a guest.

ing" 1994 contract. On November 22, 2004, respondents moved to dismiss the verified petition pursuant to CPLR 3211 (a) (7).

In opposition to respondents' motion to dismiss, petitioner submitted an affidavit of its counsel, which attached an unexecuted copy of decedent's 1981 will and a purported copy of decedent's handwritten February 4, 1998 letter to Ms. Begleiter. The affidavit explained that although petitioner was never given an original copy of the 1981 will, decedent "told [petitioner] that she had executed this Will." In the February 4, 1998 letter, decedent stated, as relevant here:

> "I have spoken to my lawyer about changing my will to make the Weitzmann [sic] Institute take over my apartment now—but he said not to change it at the present time.

> "So for now, Weitzmann [sic] will get the proceeds from the sale of the duplex upon my death."

Other than these two additional documents, petitioner presented no documentary evidence or affidavits to substantiate the allegedly repeated conversations between decedent and its employees regarding the co-op or decedent's alleged longstanding involvement with it.

Surrogate's Court dismissed the verified petition. It held that deciding respondents' motion required the application of two "intersect[ing standards of] review." Because respondents moved to dismiss, the court reasoned that all facts pleaded in the verified petition must be accepted as true. But because petitioner sought to vacate a probate decree, it was required to present a "satisfactory showing of a substantial basis for contesting the will and [a] reasonable probability of success" on the merits of its claims. Applying these standards, the court concluded that the contract and undue influence claims failed. The contract claim was insufficient, the court said, because the 1994 letters and the 1998 letter did not constitute a "clear . . . commitment to enter into a firm obligation [to] . . . [forgo] the right to testation." As for the undue influence claim, although "motive is readily alleged . . . as is opportunity," the court held that petitioner had "not raised a prima facie case of undue influence," because it failed to "raise an inference" that such influence was actually exercised. The court further reasoned that the fact that decedent's will "provided for her closest relatives, including those who took care of her during her final illness" supported the conclusion that vacatur on undue influence grounds was not warranted.

The Appellate Division affirmed. Noting that it was "[g]ranting petitioner every presumption applicable to a pre-answer motion to dismiss," the court held that the undue influence claim was properly dismissed because "[t]he record reflects no more than decedent's choice of benefitting her niece . . . after decedent's brother . . . had provided hospice care in his own home" (36 AD3d 419, 419 [2007]). Relying on *Matter of Walther* (6 NY2d 49 [1959]), the court reasoned that "[a] testator acting upon 'ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices,' is not indicative of undue influence" (*id.* at 420, quoting *Walther* at 53, quoting *Children's Aid Socy. of City of N.Y. v Loveridge*, 70 NY 387, 394 [1877]). Thus, the Court held that there was "no nonspeculative reason" to permit petitioner discovery regarding the execution of the January 11 will (*id.* at 420). In affirming dismissal of the contract claim, the court reasoned that decedent's 1998 letter did "not unequivocally refer to the alleged [1994] contract" and that that letter also indicated that decedent's intention regarding the bequest of the co-op was "not yet fully formed" (*id.*). We granted petitioner's motion for leave to appeal and now affirm.

## II.

█ Petitioner, joined by the Attorney General as statutory intervenor, argues that, when construed together, the 1994 letters between Mr. Brill and Mr. Samers and decedent's 1998 letter to Ms. Begleiter form an integrated contract that clearly evidences decedent's intent to bequeath her co-op to petitioner. Thus, they assert that this alleged contract satisfies the statute of frauds codified in EPTL 13-2.1. Respondents counter that none of the proffered correspondence is sufficient to satisfy the statute because in none of it does decedent unequivocally renounce her right to dispose of the co-op in a subsequently executed will. We agree with respondents.

EPTL 13-2.1 (a) (2) provides that "a contract to make a testamentary provision of any kind" is enforceable only if "it or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith, or by his [or her] lawful agent." This provision reflects the well-settled precept that "[t]he . . . freedom of testation is a jealously guarded right, and any promise to restrict that right must be analyzed closely for fraud" (Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 13-2.1, at 449 [2001 ed]).

The parties do not dispute that a memorandum sufficient to satisfy EPTL 13-2.1 may be set forth in separate writings that clearly refer to the subject matter of the contract, so long as one writing is signed by the party to be charged or a duly authorized agent (*see Marks v Cowdin*, 226 NY 138, 145 [1919, Cardozo, J.]; *see also Crabtree v Elizabeth Arden Sales Corp.*, 305 NY 48, 55 [1953]). But respondents dispute the contention that the three writings here unmistakably evince decedent's intent to leave her co-op to petitioner and that, if those writings are unclear as to her intent, parol evidence should be taken to resolve any ambiguity.

This case does not involve the application of the statute of frauds to an ordinary commercial contract (*see Rubin v Irving Trust Co.*, 305 NY 288, 298 [1953]). For more than a century, we have repeatedly emphasized that because a will is ambulatory in nature and because a testator has the right to freely revoke a will until death, an agreement not to revoke a prior will "demands the most indisputable evidence of . . . agreement" (*Edson v Parsons*, 155 NY 555, 568 [1898]; *Hamlin v Stevens*, 177 NY 39, 48 [1903] [contracts to make testamentary bequests should only be enforced "when they have been established by evidence so strong and clear as to leave no doubt"]; *Oursler v Armstrong*, 10 NY2d 385, 389 [1961] [because "the renunciation of the right to alter or revoke a will (is not) a casual matter . . . the Statute of Frauds . . . as well as the decisional law requires clear evidence" of such a promise]; *Rubenstein v Mueller*, 19 NY2d 228, 232 [1967] [intention must be manifested "clearly and unambiguously"]; *Blackmon v Estate of Battcock*, 78 NY2d 735, 740 [1991] ["the law strictly scrutinizes the renunciation of the right to revoke a will and requires a threshold showing of clear and unambiguous evidence to give effect to this surrender of rights"]).[5] The reason for this high evidentiary bar is simple: "[s]uch contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises" (*Hamlin*, 177 NY at 47-48).

---

5. Whether the correspondence here is characterized as forming a purported contract to make a testamentary bequest or one not to revoke a prior will is immaterial. We have held that such contracts are equivalent (*see Rubin*, 305 NY at 297 ["(T)here can be no difference between a contract 'to bequeath property or make a testamentary provision' and a contract to refrain from altering an existing will, for wills are ineffective until the death of the testator" (citation omitted)]).

The courts below correctly concluded that petitioner failed to present indisputable evidence of a contract here. Even if sent on decedent's behalf, as petitioner alleges it was, Mr. Brill's 1994 letter does not unequivocally renounce decedent's right to execute a will making no provision for petitioner. The letter inquires whether petitioner would assent to the conditions but makes no promise that any will would be executed in consideration of such assent. Even assuming that Mr. Brill's letter could be construed as an offer, it does not promise to bequeath the co-op upon acceptance. Instead, it vaguely refers to a "very substantial bequest" as consideration for the establishment of the memorial fund. This is insufficient to satisfy the statute of frauds (see *Morris Cohon & Co. v Russell*, 23 NY2d 569, 576 [1969] [memorandum sufficient to satisfy statute of frauds must establish "the subject matter of the transaction"]; cf. *Cobble Hill Nursing Home v Henry & Warren Corp.*, 74 NY2d 475, 482 [1989] ["If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract"]).

Petitioner and the Attorney General rely on decedent's 1998 letter to cure the ambiguity, but it too is unclear and ambiguous. Petitioner and the Attorney General argue that the sentence of the 1998 letter beginning "[s]o for now" should be construed as a confirmation that petitioner would receive the co-op or the proceeds of its sale upon decedent's death, but that decedent had decided not to transfer title to the charity during her lifetime. But that construction is hardly indisputable. Indeed, respondent plausibly argues—and the Surrogate found—that the phrase could equally be interpreted as indicating decedent's retention of the full complement of her testamentary rights, i.e., that petitioner was designated as a legatee "for now," but that its status could change at her discretion. And, because the 1994 and 1998 letters do not clearly evidence decedent's promise to bequeath the co-op's proceeds to petitioner, the Surrogate could not have considered parol evidence to clarify decedent's intent (see *Marks*, 226 NY at 143 [courts may not "import( ) into (a) contract a new element of promise" through the introduction of parol evidence]; *Stulsaft v Mercer Tube & Mfg. Co.*, 288 NY 255, 260 [1942] ["A custom cannot create a contract where there has been no agreement by the parties and none is implied by law"]; cf. *Crabtree*, 305 NY at 57 [parol evidence permissible because there "can be (no) doubt that the memorandum contains all of the essential terms of the contract"]). Accordingly, under our well-settled precedents,

requiring that evidence of an agreement to make a testamentary bequest must be indisputable, EPTL 13-2.1's statute of frauds bars petitioner's contract claim.[6]

## III.

■ Turning to the standard that should govern the Surrogate's consideration of a petition to vacate a probate decree upon allegations that a will was procured through the exercise of undue influence, petitioner and the Attorney General contend that the standard should be analogous to that applicable to a court's consideration of a motion to dismiss for failure to state a claim. Emphasizing that it is seeking only the opportunity to take discovery pursuant to SCPA 1404 (4), petitioner argues that a probate decree should be vacated—and such discovery permitted—if a party's verified petition contains allegations that, if taken as true, would cause a reasonable person to be uncertain that the probated will was validly made.[7] In contrast, respondents contend that a probate decree should be vacated only if petitioner can demonstrate facts constituting a substantial basis for challenging the proffered will and a reasonable probability of success on the merits of its undue influence claim.[8] We adopt respondents' proposed standard. And we conclude that the Surrogate did not abuse her discretion in refusing to vacate the decree in order to allow petitioner discovery pursuant to SCPA 1404 (4).

Under SCPA 1404 (4), "[a]ny party" to a probate proceeding may:

> "before or after filing objections to the probate of the will . . . examine any or all of the attesting wit-

---

6. Because petitioner failed to establish, through clear and unambiguous evidence, that decedent was contractually obligated to bequeath her co-op to it, it was not entitled to the co-op's proceeds under SCPA 2105. That statute permits a party to petition the Surrogate for return of property that is "alleged to be in the possession of or under the control of a fiduciary" (SCPA 2105 [1]). But it requires a showing of "facts" necessary to sustain the claim (*see id.*; *see also* 5-64 Warren's Heaton, Surrogate's Court Practice § 64.05 [2] [2007] [hereinafter Warren's Heaton] [SCPA 2105 petition "should set forth not only the claim to the property but the basis for that claim"]). Petitioner failed to make the required factual showing here.

7. The Attorney General's proposed rule is similar. He would allow SCPA 1404 (4) discovery if a pleading, when liberally construed, identifies circumstances indicating the possible exercise of undue influence.

8. Despite this contention on appeal, respondents moved to dismiss below under CPLR 3211 (a) (7) for "fail[ure] to state a cause of action."

nesses, the person who prepared the will, and if the will contains a provision designed to prevent a disposition or distribution from taking effect in case the will, or any part thereof, is contested, the nominated executors in the will and the proponents."

In connection with these examinations, a party is entitled to "all rights granted under article 31 of the civil practice law and rules with respect to document discovery" (id.).

Petitioner concedes, as it must, that it was not a necessary party to the probate proceeding. This is because it did not file any prior will in which the decedent allegedly named it as a beneficiary with Surrogate's Court (see SCPA 1403 [1] [d] [listing as necessary party "(a)ny person designated as beneficiary . . . in any other will of the same testator filed in the surrogate's court of the county in which the propounded will is filed whose rights or interests are adversely affected by the instrument offered for probate"]).[9] Accordingly, petitioner was not entitled to the discovery it now seeks as of right and was required to petition the Surrogate for vacatur of the previously-issued probate decree.[10]

The SCPA does not set forth the standard applicable to the present vacatur petition. Thus, CPLR 5015 governs (CPLR 101 [the CPLR "shall govern the procedure in civil judicial proceedings in all courts of the state and before all judges, except where the procedure is regulated by inconsistent statute"]; see also SCPA 209 [10] [Surrogate's Court "shall have all of the powers that the supreme court would have in like actions and proceedings"]). As relevant here, that statute requires a party seeking to vacate a final judgment upon the ground of newly discovered evidence to establish that such evidence "would probably have

---

**9.** Petitioner asserts that filing decedent's prior will would have been "unseemly," and that charities generally do not file wills containing philanthropic bequests because that practice would usurp a testator's prerogative to file a will before death. We note, however, that SCPA 2507, which governs the filing of wills, permits "any person" to file "any will" in the Surrogate's Court located in the county where the testator is domiciled, without providing notice of such filing to the testator (SCPA 2507 [1]).

**10.** The dissent correctly acknowledges that SCPA 1404 (4) does not support petitioner's right to the discovery that it now seeks (see dissenting op at 99). But it asserts that such discovery should be permitted in this and other cases in which the denial of discovery seems "unfair" (see id. at 98). The propriety of such an expansion of section 1404 (4), however, is a matter best left to the legislature.

produced a different result" in the original proceeding (CPLR 5015 [a] [2]).

Echoing this statutory standard, courts considering attempts to vacate probate decrees have held that the reopening of a decree is permissible only when a petitioner "show[s] facts sufficient to afford a substantial basis for the contest and reasonable probability of success" on the merits of its challenge (*Matter of Westberg*, 254 App Div 320, 321 [1st Dept 1938]; *accord Matter of Musso*, 227 AD2d 404, 406 [2d Dept 1996] ["A petitioner seeking to vacate a probate decree must establish 'with some degree of probability that his (or her) claim is well founded, and that, if afforded an opportunity, he (or she) will be able to substantiate it' "]).

Because we conclude that this standard strikes the proper balance between the Surrogate's statutory duty to "inquire particularly into all the facts" and to be "satisfied with the genuineness of the will and the validity of its execution" before admitting a will to probate (SCPA 1408 [1]) and the policy favoring the finality of validly issued decrees, we adopt it here.

We hold that to establish its entitlement to vacatur under this standard, a party must demonstrate a substantial basis for its contest and a reasonable probability of success through competent evidence that would have probably altered the outcome of the original probate proceeding (*see* Siegel, NY Prac § 428 [4th ed] [courts have generally required showing of "competent evidence" before vacating judgments under CPLR 5015 (a) (2)]).[11] Permitting vacatur of a probate decree based upon mere allegations of undue influence would be unduly disruptive and could encourage specious claims in the hope of securing unjustified settlements that would upset the legitimate expectations of a decedent's intended beneficiaries. Moreover, SCPA 1404 (4) discovery is potentially burdensome. The Surrogate has broad discretion to order discovery of, among other things:

> "correspondence, memoranda or notes between the executors of the decedent's Will and the attesting

---

**11.** In adopting this standard, we recognize the difficulties faced by charities in asserting undue influence claims. But we emphasize that a charity must take care to carefully and consistently document its interactions with prospective donors throughout their lifetimes so that it is in a position to proffer evidence demonstrating a reasonable probability of success on the merits of an undue influence challenge.

witnesses; all billings, expenses and receipts by one of the witnesses or his law firm regarding the decedent; lists of prospective heirs or other memoranda in any way reflecting the decedent's estate plan; copies of the decedent's Federal and New York income and gift tax returns; checking account ledgers, canceled checks, and other bank books; safe deposit box inventories; records of advancements made by the decedent; and copies of all correspondence relating to stock transfers" (*see* 112 Warren's Heaton § 112.08 [1] [a] [iii], citing *Matter of Delisle*, 149 AD2d 793 [3d Dept 1989]).

And, under SCPA 1404 (5), the testator's estate is solely responsible for the cost of one or more depositions that may constitute no more than a prolonged fishing expedition into the circumstances surrounding the execution of an already validly probated will. Thus, in a close case such as this, a strong showing was required before embarking on discovery.

Petitioner argues that it met its burden by its verified petition showing a dramatic departure from a longstanding testamentary plan by a testator who, at the time the challenged will was executed, was in a weakened condition and in the care of persons benefitting from that will. But to support its allegations of decedent's longstanding intent to benefit it in her will, petitioner only proffered documentary evidence consisting of: the unexecuted 1981 will, the 1994 correspondence between Messrs. Brill and Samers, and a 1998 letter purportedly drafted by decedent. The 1994 letter was an inquiry, however, and the 1998 letter did not constitute an unequivocal promise to bequeath the co-op. The verified petition also alleged that during conversations with two of its employees in 1994 and 1996 and unspecified "regular" meetings with Ms. Begleiter—from October 2, 1996 until the time of her death more than seven years later—decedent reconfirmed that she intended to bequeath the co-op's sale proceeds to petitioner. Further, petitioner alleged that at "various times" decedent discussed with a "number of [its] officials" the possibility of transferring her co-op to it inter vivos. But petitioner produced no evidence establishing that any of these alleged meetings or conversations actually occurred.[12] And although petitioner claimed that decedent "change[d] the residuary bequest" in the proffered

---

12. Contrary to respondents' assertion, the Dead Man's Statute, CPLR 4519, would pose no bar to presentation of affidavits setting forth the circum-

unexecuted 1981 will to bequeath her co-op to it, no will evidencing this alteration was offered.

The Surrogate was only confronted with a verified petition annexing evidence of decedent's alleged intent in 1981, 1994 and 1998—no evidence of her intent in the years prior to her death. The facts petitioner offered simply do not show a long-standing and detailed testamentary plan to benefit petitioner.

■ Petitioner has failed to establish a substantial basis for vacating the Surrogate's decree or a reasonable probability of success on the merits of its undue influence claim. Given that wills are "ambulatory in nature" (*Blackmon*, 78 NY2d at 739), we cannot say that, on these facts, the Surrogate abused her discretion in denying vacatur of a probate decree. Indeed, that exercise of discretion is further supported by the fact that the challenged will left decedent's co-op to her niece, a close relative whose father—decedent's brother and executor—opened his home to decedent while she received hospice care for terminal cancer during her final days (*cf. Walther*, 6 NY2d at 55 ["The evidence does not irresistibly exclude the inference that family ties, natural demands of love and affection prompted the decedent to dispose of her property in this manner"]).

## IV.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

SMITH, J. (dissenting). I agree that the evidence here does not prove undue influence was exercised. It is quite possible that decedent's brother did not do anything wrong. But there is some reason to suspect he did, and if he did petitioner will have, effectively, been cheated out of a legacy without any opportunity to prove the wrongdoing. I think this is unfair. Thus, while this record does not justify vacating the probate decree, petitioner should be given a chance, through discovery, to obtain evidence that would justify it.

Incomplete as the present record is, three troubling facts emerge: First, decedent's estate plan, beginning more than 20

---

stances surrounding the alleged conversations between petitioner's employees and decedent or to the introduction of testimony consistent with such affidavits at trial (*see* Weinstein-Korn-Miller, NY Civ Prac ¶ 4519.15 [2d ed] ["(C)orporations are almost immune from the Dead Man's Statute" because corporate employees are not "disqualified from testifying for (their) employer"]).

years before her death, included a large bequest to petitioner. Secondly, decedent changed her will in her last illness, five days before her death, to leave nothing to petitioner and the bulk of the estate to her brother's daughter. Thirdly, at the time of the change decedent was being cared for in her brother's home.

Of course, these facts could have a perfectly innocent explanation, but that leads me to a fourth troubling aspect of the case: Decedent's brother (now deceased) and his daughter, the executor and successor executor under the will, have chosen to volunteer no information whatever. It is true, of course, that they had no obligation to speak, but in my experience litigants are rarely so reticent when the facts they know would help their case. I do not suggest that their silence justifies an adverse inference, in the sense that it would in itself support vacating the probate decree. But I think the Surrogate abused her discretion in not requiring them to tell their story before deciding whether to vacate the decree or not.

If petitioner had been entitled to notice of the probate proceedings, it could have had discovery as a matter of right before deciding whether to challenge the will (SCPA 1404 [4]). Since it was not entitled to and did not get notice, it could not seek any relief until after the decree was entered. The Attorney General, appearing here as intervenor as part of his duty to protect charitable beneficiaries, argues that in circumstances like these, where there are some signs of undue influence, a disinherited charity should have the same discovery rights that section 1404 (4) would have given prior to probate. I agree. Judging from the cases cited by the parties, either discovery or an evidentiary hearing has been the normal practice in similar situations (*see Estate of Greene*, NYLJ, May 22, 1996, at 29, col 6 [Sur Ct], *affd* 240 AD2d 745 [2d Dept 1997]; *Estate of Sokol*, NYLJ, Jan. 9, 1995, at 31, col 3 [Sur Ct]; *Matter of Abrial*, 286 App Div 916 [3d Dept 1955]; *Matter of Callahan*, 273 App Div 884 [1st Dept 1948]). I see no valid reason for denying discovery here.

Chief Judge Kaye and Judges Graffeo, Read, Pigott and Jones concur with Judge Ciparick; Judge Smith dissents in a separate opinion.

Order affirmed, with costs.