*487 OPINION OF THE COURT
Kristin Booth Glen, S.
This case, involving the construction of a latent ambiguity in a will clause, foregrounds the difficulty of determining close cases in the absence of a clearly enunciated burden of proof.
An earlier decision (Matter of Gourary, NYLJ, Nov. 16, 2010, at 43, col 3) denied summary judgment on an objection in this estate accounting challenging “[the Executor’s] claim that a rare book collection (the Collection)[1] worth more than $5 million at the time of decedent’s death was included in the specific bequest of tangibles,” finding a latent ambiguity[2] requiring consideration of extrinsic evidence and directing a hearing on the issue. Familiarity with the facts set forth in that opinion is assumed, but a few need be repeated in order to place the resulting hearing, and testimony adduced there, in context.
Paul Gourary, the decedent, died on January 28, 2007, leaving an estate of approximately $17 million. His two-page will, admitted to probate on September 5, 2007, named his wife Marianne Gourary as his executor. In article second, it made a specific bequest of tangibles to Marianne, and in article third, it bequeathed the residuary, two thirds to Marianne and one third to his son John.
The article second specific bequest reads as follows:
“All household furniture and furnishings, books, pictures, jewelry and other article of personal or household use including automobiles, and all stick [sic] pertaining to my apartment in a cooperative corporation owning premise 45 East 85th Street, New York City, which I may own at the time of my death, I bequeath to my wife, Marianne c. gourary, if she survives me.”
*488 In her capacity as executor, Marianne signed and filed an estate tax return that specifically designated a “rare book collection” valued at $5.2 million, which she has deemed included in. the specific bequest to her. Whether the Collection was or was not. included in the specific bequest is the issue raised by John, as objectant to Marianne’s intermediate accounting.[3]
As this court’s prior decision noted, denying the cross motions for summary judgment,
“the record to date does not shed light on questions having material bearing on whether decedent intended all or some or none of his rare books or other rare collectibles to pass under article second as items of personal or household use as opposed to items held for investment purposes.”[4]
For example, the decision noted, the record did not disclose the number or proportion of items in the Collection that could be clearly characterized as “books,” as opposed to prints, broadsides, pamphlets, manuscripts, etc. Nor did it detail the items kept in decedent’s apartment as opposed to off-site in a safe deposit box. Nor was there information about how, if at all, the Collection, or portions of it, was insured.
Accordingly, a hearing was held on March 17, 2011, and, after the failure of settlement discussions, the instant decision makes findings of fact that resolve the ambiguity.
Evidence Adduced at the Hearing
Six witnesses testified at the hearing: petitioner/executor Marianne Gourary; Corinne Frugoni, Marianne’s daughter and decedent’s stepdaughter; Susan Boorsch, Curator of Prints, Drawings and Photographs at the Yale University Art Museum and formerly Associate Curator in the Department of Drawings and Prints at the Metropolitan Museum of Art; Eric Holzenberg, Director, The Grolier Club of New York; Rachna Sachdev, a partner at Green and Ettinger, the law firm of Paul Green, *489 now deceased, the drafter of the will at issue;[5] and objectant John Gourary. Their testimony established a number of undisputed facts.
Decedent was a passionate collector of pre-1800 materials relating to festivals, or “fetes,” and had been engaged in assembling the Collection for many years, beginning before his marriage to Marianne. The Collection consisted of books (in a number of languages including languages which neither he nor Marianne spoke or read), prints, manuscripts, pamphlets, scrolls and broadsides.[6] Most of the Collection was maintained in decedent’s apartment, the books in a glass-fronted bookcase prominently featured in the living room, with other items in storage boxes specially constructed to avoid damage from light and dust. Some 21 larger items were kept in a safe deposit box at a nearby bank. Marianne, a collector in her own right,[7] assisted him in assembling the Collection, and whenever pieces from the Collection were lent to museums, including the Metropolitan Museum of Art, the Dartmouth Art Museum, the Brown University Art Museum, and the College of Staten Island, their provenance was described as that of “Mr. and Mrs. Paul Gourary.”[8]
The Collection was insured under the “Valuable Items” rider to decedent’s and Marianne’s household policy,[9] which in turn referred to a “schedule consisting of books, manuscripts, drawings, etc. on file with company.” That schedule, attached to the *490 policy, includes an initial list of 241 items denominated “Books,” and 33 items under a separate heading, “Manuscripts - Drawings - Engravings.” There are 12 appended lists, apparently reflecting additions to the Collection, made over almost two decades. They are variously titled, “Books, Prints and Drawings” (1967, 1979, 1980, 1981, 1983); “Books, Drawings and Prints” (1969, 1971, 1974, 1975, 1976, 1978); and “Books, Manuscripts, Prints and Drawings” (1977). The letterhead on each of the lists is a printed title, “Paul Gourary” with “Mr. and Mrs.”[10] handwritten above or in front of the printed matter. The values assigned to each item were, apparently, the purchase price, and according to Marianne, decedent specifically noted that the Collection was underinsured.
In their testimony, both Frugoni and Holzenberg put to rest any notion that decedent was “collecting for investment purposes.” However, shortly after decedent’s death, Marianne began the process of monetizing the Collection, first bringing the items in the safe deposit box to the apartment, and then engaging Christie’s to auction off the vast majority of the pieces contained in it.* [11]
Perhaps the most significant testimony was that of Eric Holzenberg, who explicated the nature of “collections” and “collecting.” He explained, for example, that the Grolier Club is
“not a book club in the sense that people get together and discuss current novels or nonfiction books and discuss them back and forth. The Club is made up of people who are, certainly, concerned with books as information, as texts, but also as historical artifacts, as objects of art, and as the focus of collecting.”
Collectors, like decedent, are, he explained, interested in the “historical value, the state of bibliography or scholarship” of objects “worthy of being collected together.” He elucidated this latter phrase and the term “collection” in general, by describing a “collector” as “somebody collecting in an area that hasn’t been collected very heavily before or that a collector is taking a new approach to putting together a collection of books” and further explained, “the goal being to discover something about *491 these books that wasn’t known before or that allows scholars and collectors to look at these books in a new way.”
The Law
Where a will contains an ambiguity, the court’s primary, overriding task is to determine the decedent’s intent (see e.g. Matter of Carmer, 71 NY2d 781, 785 [1988]). Various canons and rules of grammatical construction may be utilized in aid of this endeavor (see e.g. Matter of Walker, 64 NY2d 354 [1985] [ejusdem generis]; Matter of Falvey, 15 AD2d 415 [4th Dept 1962] [same]; Duane Reade, Inc. v Cardtronics, LP, 54 AD3d 137, 141 [1st Dept 2008] [last antecedent doctrine]; Kahn Lucas Lancaster, Inc. v Lark Intl. Ltd., 186 F3d 210 [2d Cir 1999] [supplementary rule of punctuation to the last antecedent doctrine], abrogated in part on unrelated issue, Sarhank Group v Oracle Corp., 404 F3d 657, 660 n 2 [2d Cir 2005]; Matter of Riecke, 165 Misc 566 [Sur Ct, Kings County 1937] [avoiding redundancies in language testator used]), but are not, in themselves, dispositive (Matter of Larkin, 9 NY2d 88 [1961]) and, indeed, when literally applied, often lead to opposite results.
Here, for example, the parties argue about the placement of commas in the phrase “household furniture or furnishings, books, pictures, jewelry and other articles of personal or household use” and whether the phrase “of personal or household use” modifies all that comes before, or only “other articles.” Engaging in mechanical reading of the text could result in several different but plausible constructions: that all “books” and “pictures” (but not manuscripts, broadsides, pamphlets, etc.) are included in article second; that all items displayed (and thus “used”) are included, but those stored in boxes, wherever located, are not; that all items located in the apartment are included, but those stored at the bank are not; that “books” has its usual meaning (see e.g. Matter of Gustafson, 74 NY2d 448 [1989]; Matter of Walker, 64 NY2d 354 [1985]) such that the hardback novels and nonfiction books that decedent read, enjoyed, and retained are the objects referred to in article second, but the “books” and other protected items in the Collection are not; etc.
The task of construction is made more difficult by the absence of a clear burden of proof. The parties were repeatedly asked which bore the burden of proof, and what the burden is (i.e., preponderance, or clear and convincing) but neither provided *492 any compelling authority,[12] nor was the court successful in locating any helpful New York precedent. Instead, appellate cases make pronouncements like “[w]here the language of the will does not affirmatively show the claimed intention, the burden of establishing such intention is on the party seeking to effectuate it” (Matter of Revson, 86 AD2d 872, 874 [2d Dept 1982]), which would appear to place equal burdens on both parties. The Restatement also fails to provide assistance to the trier of fact in a close case, such as this, stating: “e. Construction by fiduciary or other payor. In resolving an ambiguity in a donative document, the construction placed on the document by a fiduciary (or other payor) is not entitled to a presumption of correctness in litigation. The court resolves the matter de novo” (Restatement [Third] of Property [Wills and Other Donative Transfers] § 11.2, Comment e, at 322). Although the absence of burden allocation is understandable,[13] it makes the task of a trier of fact significantly more difficult in cases which, by their very nature, involve ambiguity or lack of clarity.
There are at least two possibilities for allocation of the burden, which would serve, at least in some cases, conflicting policies. There could be a presumption that the construction of the will proposed by the executor is correct, placing the burden on objectant.[14] This allocation would, arguably, further the *493 decedent’s general intent as demonstrated by her choice of a particular person as her fiduciary. On the other hand, where the executor herself is a beneficiary who would benefit from a particular construction, the burden might be placed on her. This would further the general principle that a fiduciary owes loyalty to all beneficiaries and may not engage in self-dealing. Or, these allocations could be adopted together (i.e., burden on objectant unless fiduciary is a beneficiary under the ambiguous language; then burden shifts), thus providing greater certainty and decreasing the litigation burden on the courts.[15]
In the absence of appellate guidance, however, the court is left in a situation similar to another issue in which no burden of proof has been imposed, determining the “best interests of the child” in initial custody and visitation proceedings between parents (see Domestic Relations Law § 240 [1] [a] [“In all cases there shall be no prima facie right to the custody of the child in either parent”]; Alan G. v Joan G., 104 AD2d 147 [1st Dept 1984]; 27C CJS, Divorce § 1028 [neither parent should have a greater burden than the other in attempting to gain custody in an original custody proceeding]; see also 3 Tippins, New York Matrimonial Law and Practice §§ 20:3, 20:4), which has been heavily criticized (see e.g. Selfridge, Equal Protection and Gender Preference in Divorce Contests Over Custody, 16 J Contemp Legal Issues 165, 170-172 [Spring 2005] [noting the criticisms of the “best interests” standard]). What follows, therefore, is the court’s best evaluation, based on the evidence adduced at the hearing, of what decedent meant in executing the ambiguous will at issue here.
Discussion
The single most important “fact” emerging from the hearing relates to the meaning of “collection” as it, in turn, relates to the items in controversy, however denominated. That is, rather than a number of independent objects — books, prints, etc. — the “Collection” was, itself, the entity: an amalgamation, carefully *494 assembled, that, in and of itself, constituted an object of research, study and contemplation. Whether described in exhibition catalogues, articles in art publications, conversations between decedent and curators, or in the Form 706 estate tax return signed by Marianne, there were not simply, or primarily, x number of individual books, y number of prints, z number of manuscripts, etc., but rather a single whole, greater than the sum of its parts, understood and valued as such. Decedent spent much of his life — often with Marianne’s loving assistance— creating the Collection, that is, literally, continuously[16] making something, of continuing growth, that was of scholarly, historical, bibliographical and aesthetic value considered as a whole.
As such, it is difficult to believe that decedent intended to include this, his life’s avocation, in the pedestrian phrases “books, pictures . . . and other items of personal or household use.” Instead, it seems more likely that the absence of any mention of the Collection, a major asset, like the absence of mention or description of decedent’s stock portfolio, was intentional, and reflected an intention, on the one hand, to leave his widow a home filled with that which she herself used, but to divide his major assets (apart from the specifically noted cooperative apartment) between her and his son by consigning them to his residuary estate.
Another piece of evidence, adduced at the hearing, strongly supports this conclusion. This is a letter, written by decedent on the same date that he executed his will, to his stepdaughter Corinne Frugoni. According to Frugoni, she had been included in his prior will,[17] but “then, apparently, he changed his will and he took me out of his will, and then wrote this letter to me.” The letter reads as follows:
“Dear Corinne,
“I have today executed a will which provides that in the event that Marianne predeceases me, you will receive one-third (1/3) of my estate, John’s children will receive as much as the law permits without a double tax, and the balance will go to John.
“It is my intention that you and your brother *495 receive one-third (1/3), and his children receive one-third (1/3.) However, this can’t be accomplished without paying substantial additional estate tax (also known as generation skipping tax.) I have therefore left more to John and less to his children, but it is my wish, which I have conveyed to John that he in effect carry out my intention.
“Should I die before your mother, then I expect that you will be taken care of by her from the two-third, (2/3) [sic] of the estate she is inheriting.
“All my love,
“[/s] Paul” (emphasis added).
The letter thus clearly states decedent’s intention, if he predeceased Marianne, to leave two thirds of his estate to her (out of which, presumably, she could provide for Frugoni) and one third to his son, the objectant.
Understandably separating out the home which they had shared,[18] decedent left his financial and monetizable assets, a considerable stock portfolio, and the valuable Collection to his wife and son in a two-thirds/one-third split. If the Collection were to be included in article second, his son would receive only about one sixth of his estate, an amount entirely inconsistent with the intent expressed by decedent in his contemporaneous letter to Frugoni.
For these reasons, in the absence of a strong burden on object-ant, the court finds from all the evidence that decedent intended the Collection to pass in his residuary estate. Accordingly, the objection is sustained, and the Collection passes via article third, the residuary clause of decedent’s will.

. The parties have variously referred to it as a “rare book collection,” “the Festivities Collection” or “the Fetes Collection.” For simplicity, it will be here denominated “the Collection.”

. There are two classes of latent ambiguity: where there are two or more things exactly measuring up to the description in the will, and where no person or thing exactly answers the declarations and descriptions of the will, but two or more persons or things answer the description imperfectly. Here the phrase, “books . . . pictures,” in the specific bequest, could mean the books and other printed materials included in the Collection, as urged by the executor, or could mean the ordinary books: novels, nonfiction, biography, etc., read and retained by decedent, and the pictures hanging on the walls and otherwise decorating the apartment, but not the books, prints, manuscripts, scrolls, etc. that made up the Collection as urged by objectant.

. Of the numerous objections, all, except those relating to attorneys’ fees, accountants’ fees, the overstating or reduction of commissions, and a $200,000 transfer by petitioner prior to decedent’s death, have been resolved by decision or stipulation.

. In fact, as the trial record demonstrated, the dichotomy between household/personal items, and items “held for investment purposes” was too narrow, as the nature of a “collection” was more fully explicated by the witnesses specializing in this area (see discussion below). The precise language used in the prior decision does not, however, limit the ultimate inquiiy, which is to ascertain the decedent’s intent.

. Her proffered testimony, about statements allegedly made by decedent to his lawyer regarding the Collection, might well have been important or even dispositive, but was barred in response to an objection of double hearsay.

. The Christie’s Catalogue of the Marianne and Paul Gourary Collection of Rare Books listed a total of 570 lots of which 108 consisted of objects other than books. Those 108 lots consist of 751 nonbook items described as “print,” “broadsheet,” “woodcut,” “long continuous roll,” “sheets,” “bound pamphlet,” “engraved plate,” “folio sheets,” “albums,” etc.

. She collected books by a Swiss cartoonist, Teuffer, and, later, books about cats. She was elected to membership in the Grolier Club, an association of collectors, in 2003 or 2004, many years sifter her husband, who was elected in 1952.

. At various points in the hearing, as in her posthearing brief, Marianne appears to claim that she was a joint owner of the Collection, while conceding that all purchases were made from decedent’s separate account. However, her declaration on the estate tax return listing the Collection as decedent’s separate property binds her here (see Matter of Appleby, NYLJ, Sept. 26, 2011, at 30 [Sur Ct, NY County, Glen, S.], citing Mahoney-Buntzman v Buntzman, 12 NY3d 415 [2009] and Naghavi v New York Life Ins. Co., 260 AD2d 252 [1st Dept 1999]).

. Other separate categories were “jewelry,” “silverware,” and “furs.”

. This is further evidence that might have supported Marianne’s claim to joint ownership (but see n 8, supra).

. Although she made memorial gifts of four pieces, she testified that she “never thought about” keeping the Collection together and giving it to a museum or leaving it to a museum on her death.

. Objectant’s counsel cited Floyd v Carow (88 NY 560 [1882]). That opinion, which nowhere mentions the burden of proof, is based primarily on the canon of construction, not relevant here, that there is a presumption against intestacy, and this is the proposition for which it has been cited frequently.

. Burdens of proof often reflect unstated assumptions or an affirmative showing of some fact that is deemed critical. For example, in the probate of wills, a critical fact a court must find is that the decedent had capacity; thus the burden is on proponent (Matter of Kumstar, 66 NY2d 691, 692 [1985]), though the law has made it easy to satisfy, as a practical matter, by the self-proving affidavit (see SCPA 1406 [1]; Matter of Schlaeger, 74 AD3d 405 [1st Dept 2010] [affidavit provides prima facie proof of what is contained therein, which usually includes a recitation about testator’s capacity]). On the other hand, because of an assumption that most wills reflect the free choices of testators, the burden of showing undue influence, duress, or fraud is placed on the objectant (Matter of Kindberg, 207 NY 220 [1912]; Matter of Clapper, 279 AD2d 730, 732 [3d Dept 2001] [citations omitted]). Where ambiguity occurs in a will, however, almost by definition there can be no assumption of what the decedent intended.

. The Restatement permits the burden allocation via a “strong presumption of correctness,” where “the donative document grants the fiduciary (or other payor) authority to resolve questions of construction and provides that *493 the fiduciary’s decision shall be binding on all interested parties,” but only if the decision is not made arbitrarily or in bad faith (Restatement [Third] of Property [Wills and Other Donative Transfers] § 11.2, Comment e, at 322). There is no such provision in the decedent’s will.

. This is a legitimate principle that underlies a number of rules in the wills and estates area {e.g. EPTL 3-2.1 [Statute of Wills, execution requirements]; see Matter of American Comm. for Weizmann Inst. of Science v Dunn, 10 NY3d 82, 95-96 [2008] [choosing appropriate burden for vacating probate decrees in order to avoid “specious claims in the hope of securing unjustified settlements” which would be “unduly disruptive”]).

. The almost yearly supplements to the valuable items rider to the insurance policy covering the Collection attests to decedent’s ongoing pursuit of items that were not necessarily valued in the abstract, but as increasing and enhancing the Collection of which they became a part.

. While the issue of inheritance did not seem of great consequence to her, she testified that “[a]t one point it was important to my mother that I be included in his will.”

. The bequest of enumerated items and others “of household or personal use” clearly furthered an intent to leave a spouse of many years in a basically unchanged domestic setting. That retention of the Collection was not necessary to this end was best demonstrated by the speed with which Marianne caused it to be sold. Although her brief suggests that this might have been because of fear that she otherwise would have inadequate assets to maintain her familiar lifestyle (petitioner’s post-hearing mem of law at 6 n 2), her trial testimony did not mention this as a concern. Instead, she testified, “there came a time when I decided I must sell the whole collection because I was not going to [peddle] books . . . and I wanted to make sure that it’s handled properly because it’s a rare book collection.” She was concerned about the “very great responsibility to have them at home.” She testified that although “one dealer wanted to buy it. . .1 finally decided I don’t want to go abroad.” Instead, she “wanted a dollar auction .... handled properly and Christie’s came [to her home to catalog the items]” and then offered them at auction.