*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  July 24, 2014          517693
_____

In the Matter of the Estate of
    FRANK PREVRATIL, Deceased.

NEIL PREVRATIL, as Executor of
    the Estate of FRANK
    PREVRATIL, Deceased, Under
    a Will Dated September 28,
    2006,
                    Appellant.

(Proceeding No. 1.)

_____

In the Matter of the Estate of
    FRANK PREVRATIL, Deceased.          OPINION AND ORDER

REBECCA L. ADRIAN et al., as
    Beneficiaries and/or Proposed
    Administrators CTA of the
    Estate of FRANK PREVRATIL,
    Deceased, Under a Will Dated
    May 24, 2011,
                    Respondents;

NEIL PREVRATIL,
                    Appellant,
          and

CHARLES PREVRATIL,
                    Respondent.

(Proceeding No. 2.)

_____

In the Matter of the Estate of
    FRANK PREVRATIL, Deceased.

FRANK A. PREVRATIL, as Executor
    of the Estate of FRANK
    PREVRATIL, Deceased, Under
    a Will Dated May 24, 2011,
                        Petitioner;

NEIL PREVRATIL,
                        Appellant.

(Proceeding No. 3.)
_____

Calendar Date:  March 26, 2014

Before:  Peters, P.J., Lahtinen, McCarthy and Garry, JJ.

_____

        John T. Casey Jr., Troy, for appellant.

        Rowlands & LeBrou, PLLC, Latham (James J. LeBrou of
counsel), for respondents in proceeding No. 2.

_____

Peters, P.J.

        Appeal from an order of the Surrogate's Court of Columbia
County (Nichols, S.), entered January 17, 2013, which granted a
motion by petitioners and Charles Prevratil in proceeding No. 2
for summary judgment dismissing Neil Prevratil's objections to a
May 24, 2011 will of decedent.

        In 2006, decedent executed a will naming one of his two
sons, Neil Prevratil, as executor and sole beneficiary of his

estate.  The major asset of decedent's estate was a farm which he used as a refuge for rescued horses.  In February 2011, after decedent was diagnosed with lung cancer, he contacted an attorney for the purpose of revising his will.  As decedent's medical condition worsened, decedent's brother, Charles Prevratil, and sister-in-law, Deborha Prevratil, traveled from their home in Florida to New York in April 2011 to care for decedent.  On May 24, 2011, five days before his death, decedent executed a new will in which he named his other son, petitioner Frank A. Prevratil, as executor, and divided his estate equally between decedent's friends, petitioners Sonya J. Stack and Rebecca L. Adrian (hereinafter collectively referred to as petitioners), and Charles Prevratil.  The will specifically disinherited Neil Prevratil.

On June 20, 2011, Neil Prevratil commenced proceeding No. 1 seeking to admit decedent's 2006 will to probate.  Petitioners thereafter prevailed upon Frank A. Prevratil and his wife – the named successor executor – to petition to admit the 2011 will to probate.  After they allegedly refused to do so, on August 6, 2011, petitioners commenced proceeding No. 2 seeking to admit the 2011 will to probate.  Frank A. Prevratil subsequently commenced proceeding No. 3 also seeking probate of the 2011 will.  Neil Prevratil filed objections to the 2011 will, claiming improper execution, lack of testamentary capacity and that the will was procured by fraud and undue influence, and also seeking a determination that petitioners had triggered the will's no contest clause by offering the will for probate and seeking letters of administration.  Following discovery, petitioners and Charles Prevratil (hereinafter collectively referred to as the proponents) moved for summary judgment dismissing the objections.  Surrogate's Court granted the motion and this appeal by Neil Prevratil ensued.

First addressing the challenge to decedent's testamentary capacity, the burden rested with the proponents to demonstrate that decedent "understood the consequences of executing the will, knew the nature and extent of the property being disposed of and knew the persons who were the natural objects of [his] bounty, and [his] relationship to them" (Matter of Ruparshek, 36 AD3d 998, 999 [2007]; see Matter of Kumstar, 66 NY2d 691, 692 [1985]).

Here, the proponents offered the self-executing affidavit of the attesting witnesses, who opined that decedent was of sound mind and memory and in all respects competent to make a will. This constituted prima facie evidence of the facts attested to and created a presumption of testamentary capacity (see Matter of Walker, 80 AD3d 865, 866 [2011], lv denied 16 NY3d 711 [2011]; Matter of Paigo, 53 AD3d 836, 838 [2008]). Further, the testimony of these two witnesses and Harry Miller, the attorney who drafted the will, established that decedent was aware of the nature and extent of his property and knew who the objects of his bounty were both prior to and at the time of execution. To that end, Miller testified that decedent ardently wished the farm to remain a horse sanctuary after his death and, believing that Neil Prevratil would promptly sell the property, decided to change his will to devise such property to petitioners, who would further that goal.

With the burden shifted to Neil Prevratil to produce evidence demonstrating a triable issue of fact (see Matter of Scaccia, 66 AD3d 1247, 1251 [2009]; Matter of Murray, 49 AD3d 1003, 1005 [2008]), he focused upon decedent's weakened condition and use of analgesic medications during the period of time preceding the will signing. That decedent suffered from terminal cancer and was in a declining physical state as a result thereof does not, without more, create a question of fact on the issue of testamentary capacity, as "the appropriate inquiry is whether the decedent was lucid and rational" at the time the will was signed (Matter of Paigo, 53 AD3d at 838 [internal quotation marks and citations omitted]; see Matter of Alibrandi, 104 AD3d 1175, 1176 [2013]; Matter of Murray, 49 AD3d at 1005; Matter of Williams, 13 AD3d 954, 957 [2004], lv denied 5 NY3d 705 [2005]). Furthermore, Deborha Prevratil testified that decedent stopped taking pain medication on the evening before the will signing "because he wanted to be of clear mind," and there is no evidence in the record of any medication ingestion by decedent until after the 2011 will had been executed. Lacking any proof that decedent was not rational, lucid or competent at the time he executed the will, Surrogate's Court properly granted summary judgment dismissing this objection (see Matter of Castiglione, 40 AD3d 1227, 1228 [2007], lv denied 9 NY3d 806 [2007]; Matter of Seelig, 13 AD3d 776, 777 [2004], lv denied 4 NY3d 707 [2005]).

Neil Prevratil also argues that decedent's will was the product of undue influence on the part of Deborha Prevratil and the proponents. "To establish undue influence, the burden is on the objectant to show that the influencing party's actions are so pervasive that the will is actually that of the influencer, not that of the decedent" (Matter of Malone, 46 AD3d 975, 977 [2007] [citations omitted]; see Matter of Greenwald, 47 AD3d 1036, 1037 [2008]).

> "[T]he influence exercised [must] amount[]
> to a moral coercion, which restrained
> independent action and destroyed free
> agency, or which, by importunity which
> could not be resisted, constrained the
> testator to do that which was against his
> [or her] free will and desire, but which
> he [or she] was unable to refuse or too
> weak to resist" (Matter of Walther, 6 NY2d
> 49, 53 [1959]; see Matter of Alibrandi,
> 104 AD3d at 1178; Matter of Greenwald, 47
> AD3d at 1037).

Although undue influence may be proven through circumstantial evidence, such evidence must be "of a substantial nature" (Matter of Walther, 6 NY2d at 54 [internal quotation marks and citations omitted]; see Matter of Aoki, 99 AD3d 253, 265 [2012]; Matter of Moles, 90 AD3d 473, 474 [2011]).

Initially, we find that the evidence adduced was insufficient to establish that a confidential relationship existed between decedent and either Stack or Deborha Prevratil, such that the burden would shift to the proponents to show that the transaction from which they benefitted was free from undue influence (see Matter of Graeve, 113 AD3d 983, 984 [2014]; Matter of Seelig, 13 AD3d at 779; Feiden v Feiden, 151 AD2d 889, 891 [1989]).[1]  Although Stack transmitted documents to decedent's

---

[1]  Neil Prevratil's argument that a confidential relationship existed between decedent and either Adrian or Charles Prevratil is raised for the first time on appeal and, as

attorneys during the revision process — including both the initial changes naming her and Adrian as beneficiaries of the estate as well as the subsequent addition of Charles Prevratil as a beneficiary — Miller testified that decedent had authorized documents to be sent to him through Stack, as decedent did not have a fax machine. Testimony further established that any changes to the will were reviewed with decedent to confirm that they reflected his intent. There is nothing in the record to indicate that Stack's role was anything more than a "conduit to effectuate decedent's desires" (Matter of Greenwald, 47 AD3d at 1038). As for Deborha Prevratil, although she prepared meals and administered medications for decedent in the final period of his illness, he was not under her exclusive care and control and had fairly regular contact with friends as his illness progressed (compare Oakes v Muka, 69 AD3d 1139, 1140 [2010], appeal dismissed 15 NY3d 867 [2010]). Nor was there any proof that decedent's mental condition had deteriorated or that Deborha Prevratil had any role in his financial affairs. Moreover, any legal presumption that decedent's decision to include Charles Prevratil as a beneficiary was the product of undue influence was counterbalanced by the familial relationship between the two (see Matter of Walther, 6 NY2d at 56; Jacks v D'Ambrosio, 69 AD3d 574, 575 [2010]; Matter of Zirinsky, 43 AD3d 946, 948 [2007], lv denied 9 NY3d 815 [2007]; Matter of Swain, 125 AD2d 574, 575 [1986], lv denied 69 NY2d 611 [1987]).

With the burden thus remaining with Neil Prevratil, we find that there has been no showing that any of the proponents actually exercised undue influence with respect to the distribution of decedent's assets. The evidence established that decedent's relationship with Neil Prevratil had rapidly deteriorated in the years preceding decedent's death, and decedent feared that Neil Prevratil would sell the farm if it were devised to him. With the exception of one brief encounter, the two had no contact during the year and a half leading up to decedent's ultimate demise. The affidavit of a long-time friend

---

such, is not preserved for our review (see Matter of Buchting, 111 AD3d 1114, 1117 n 4 [2013]; Matter of Walker, 80 AD3d at 868 n).

of decedent established that, as early as 2009, decedent indicated his intent to leave his farm to petitioners. Another of decedent's friends testified that, after being diagnosed with lung cancer, decedent told him that he wanted to leave his property to the proponents. These individuals explained that decedent wished the farm to remain a refuge for rescued horses after his death, and believed that petitioners — both of whom worked on the farm — would continue farm operations after he died.

Miller testified that he had various discussions with decedent regarding the disposition of his estate beginning in February 2011, and confirmed that he drafted the will based on decedent's instructions. In that regard, Miller too testified that decedent indicated that he did not wish to devise the farm to his sons because they "were simply going to sell [it] when he died," and believed that petitioners would continue to use the farm as a refuge for rescued horses should he devise it to them. According to the paralegal who witnessed the execution of the will, decedent mentioned Neil Prevratil in the course of the will signing, indicating that he was intentionally disinheriting Neil Prevratil because he refused to respect his wishes. Phillip Tribble, the attorney who supervised the execution ceremony as a substitute for Miller, testified that he reviewed the will "paragraph by paragraph" with decedent during the course of the execution ceremony. Notably, none of the proponents was present when decedent executed the will, and both Tribble and the paralegal testified that decedent did not appear to be under any restraint or duress at the time.

In response, Neil Prevratil's attempt to show the actual exercise of undue influence consisted of allegations that were conclusory and speculative (see Matter of Scaccia, 66 AD3d at 1252; Matter of Nofal, 35 AD3d 1132, 1135 [2006]). The only argument made with regard to Adrian is that she may have had an intimate relationship with decedent at some point in time, an assertion which finds no support in the record and does not, in any event, rise to the level of undue influence. Furthermore, as noted, the unrefuted testimony establishes that Stack was merely serving as a conduit for information during the process of revising decedent's will. As for Deborha Prevratil and Charles

Prevratil, Neil Prevratil argues that the addition of Charles Prevratil as a beneficiary just one day before the will signing, and during a time when they were living at decedent's home and providing care for him, creates an issue of fact as to undue influence. Yet neither "the promptings of affection[,] the desire of gratifying the wishes of another[,] the ties of attachment arising from consanguinity, [n]or the memory of kind acts and friendly offices" is indicative of undue influence (Matter of Walther, 6 NY2d at 53 [internal quotation marks and citation omitted]; see Matter of Aoki, 99 AD3d at 266; Matter of American Comm. for Weizmann Inst. of Science v Dunn, 36 AD3d 419, 419-420 [2007], affd 10 NY3d 82 [2008]; Matter of Arnold, 78 AD2d 753, 753 [1980], appeal dismissed 53 NY2d 703 [1981]). While Neil Prevratil hypothesizes that the addition of Charles Prevratil as a beneficiary was induced by improper influence rather than gratitude and affection,[2] "[a]n inference of undue influence cannot be reasonably drawn from circumstances when they are not inconsistent with a contrary inference" (Matter of Walther, 6 NY2d at 54; see Matter of Stafford, 111 AD3d 1216, 1219 [2013]; Matter of Walker, 80 AD3d at 868; Matter of Nofal, 35 AD3d at 1135-1136). Accordingly, the objection grounded upon undue influence was also properly dismissed.

Neil Prevratil's fourth objection requested that Surrogate's Court construe the language of the no contest clause in such a way as to find that, by offering the 2011 will for probate and seeking letters of administration, petitioners

_____

[2] Although Neil Prevratil places emphasis on a phone conversation allegedly had between Frank A. Prevratil and Deborha Prevratil, wherein Deborha Prevratil allegedly expressed frustration with decedent for failing to do something concrete about his will, this does not constitute "direct evidence that [Deborha Prevratil or Charles Prevratil] did anything to actually influence decedent's distribution of [his] assets" (Matter of Walker, 80 AD3d at 868; accord Matter of Stafford, 111 AD3d 1216, 1219 [2013]). In any event, under the circumstances of this case, such hearsay testimony would be insufficient to raise an issue of fact (see Kaufman v Quickway, Inc., 64 AD3d 978, 980-981 [2009], affd 14 NY3d 907 [2010]).

forfeited the interests granted to them under the will. While Surrogate's Court implicitly rejected such a reading of the no contest clause by dismissing that objection, it was without authority to construe the terms of the will prior to probate. The Court of Appeals has stated that "[p]robate logically precedes construction," since "there is no will to construe" prior to probate (Matter of Davis, 182 NY 468, 475 [1905]; accord Matter of Martin, 17 AD3d 598, 599 [2005]). There is not a no contest clause exception to the rule that a will must be probated in order for a court to construe any of its provisions (see Matter of Martin, 17 AD3d at 599; Matter of Baugher, 29 Misc 3d 700, 702-703 [2010]; Matter of Shear, 182 Misc 2d 684, 686 [1999]; Matter of Zurkow, 74 Misc 2d 736, 738 [1973]; but see Matter of Grupp, 160 Misc 2d 407, 411-413 [1994]). Rather, pursuant to SCPA 1420 (3), it is only "[u]pon the entry of a decree admitting the will to probate" that a court may resolve a party's request for a determination of the construction or effect of a provision of the will. Here, Surrogate's Court's order made no decree admitting the will to probate, and we take judicial notice of the fact that such decree has yet to issue. This need not detain us, however, as we possess "concurrent jurisdiction [with Surrogate's Court] in matters involving decedents' estates" (Dunham v Dunham, 40 AD2d 912, 913 [1972]; see NY Const, art VI, §§ 1 [a]; 4 [k]; 7 [a]; 12 [f]; H & G Operating Corp. v Linden, 151 AD2d 898, 900 [1989]; see also Judson v Central Vt. R.R. Co., 158 NY 597, 601 [1899]). Given that the parties have fully briefed their arguments regarding the construction and effect of the no contest clause, and mindful that Surrogate's Court was obliged to admit the 2011 will to probate upon dismissal of the first three objections (see SCPA 1408 [2]; Matter of Pascal, 309 NY 108, 113 [1955]; Matter of Cherkoff, 9 AD2d 557, 558 [1959]), we will exercise our power to admit the will to probate and reach the merits of the dispute in the interest of judicial economy and to avoid unnecessary future ligation.

While enforceable, no contest clauses are disfavored and must be strictly construed (see Matter of Singer, 13 NY3d 447, 451 [2009]; Matter of Fairbairn, 46 AD3d 973, 974 [2007], lv denied 10 NY3d 708 [2008]; Oakes v Muka, 31 AD3d 834, 835 [2006], supra). The no contest provision at issue provides for revocation of a beneficiary's interest if the beneficiary

"contest[s] the probate or validity of [the] Will or any
provision thereof, or . . . institute[s] . . . any proceeding to
. . . prevent any provision [of the Will] from being carried out
in accordance with its terms."  Here, petitioners did not contest
the validity of the will or any of its provisions by seeking to
admit the will to probate (see Matter of Stralem, 181 Misc 2d
715, 718 [1999]; see generally SCPA 1402 [1] [b]; EPTL 3-3.5 [b]
[1]; cf. Matter of Fairbairn, 46 AD3d at 974).  Rather, given
that Neil Prevratil had already offered the 2006 will for probate
nearly two months earlier, they reasonably undertook to probate
the 2011 will themselves after the nominated executor and
successor executor thereunder failed to do so.

         To the extent that petitioners sought letters of
administration, we cannot conclude that, by including the no
contest clause in his will, decedent intended to preclude a
beneficiary from challenging or otherwise questioning the conduct
of a fiduciary.  "We begin, of course, with the elemental
proposition that in construing a will the court's foremost
objective is ascertainment of [the] decedent's intent, and,
concomitantly, effectuating the will's purpose (Matter of Carmer,
71 NY2d 781, 785 [1988]; see Matter of Singer, 13 NY3d at 451;
Matter of Covert, 97 NY2d 68, 74 [2001]; Matter of Bieley, 91
NY2d at 520, 525 [1998]; Matter of Fabbri, 2 NY2d 236, 239
[1957]).  The decedent's intent must be ascertained "'not from a
single word or phrase[,] but from a sympathetic reading of the
will as an entirety and in view of all the facts and
circumstances under which the provisions of the will were
framed'" (Matter of Bieley, 91 NY2d at 525, quoting Matter of
Fabbri, 2 NY2d at 240; accord Matter of Carmer, 71 NY2d at 785-
786; Matter of Stiefel, 24 AD3d 994, 996 [2005], lv dismissed 6
NY3d 843 [2006]; Matter of McCabe, 269 AD2d 727, 728 [2000]; see
Matter of Scale, 38 AD3d 983, 984 [2007]).  Where the instrument,
taken as a whole, establishes a dominant dispositional scheme,
individual provisions must be read to carry out that scheme,
"notwithstanding that general rules of interpretation might point
to a different result" (Matter of Bieley, 91 NY2d at 525
[internal quotation marks and citation omitted]; see Matter of
Carmer, 71 NY2d at 785-786; Matter of Thall, 18 NY2d 186, 192
[1966]; Matter of Fabbri, 2 NY2d at 240; Matter of Murray, 84
AD3d 106, 113 [2011], lv denied 18 NY3d 874 [2012]; Matter of

White, 65 AD3d 1255, 1257 [2009]; Matter of McCabe, 269 AD2d at 728).

Decedent's intent, as manifested in the 2011 will, is plain. Quite obviously, what decedent desired was that the entirety of his estate be distributed equally to, and remain with, the proponents. Indeed, the will makes assiduous provision for the continuation – under the proponents' collective care – of decedent's farm for rescued horses. By contrast, the will expressly "made no [dispositional] provision[]" for either Neil Prevratil or Frank A. Prevratil. While petitioners admittedly sought letters of administration in conjunction with proceeding No. 2, they did so nearly three months after decedent's death, some seven weeks after Neil Prevratil offered the 2006 will for probate and only after the fiduciaries named in the 2011 will refused to seek probate of the will under which they were named. Petitioners' request for letters of administration was, under the circumstances, consistent with a desire to effectuate – rather than defeat – decedent's express testamentary scheme. Thus, although the no contest clause in the 2011 will purports to disinherit any beneficiary who "shall institute . . . any proceeding to . . . prevent any provision [of the will] from being carried out in accordance with its terms," an isolated and overly literal reading of the clause would "constitute an abdication of the [C]ourt's duty to accomplish, as nearly as possible, the disposition actually intended by the testator, and would reduce its task to a simple exercise in semantics" (Matter of Fabbri, 2 NY2d at 243; see Matter of Carmer, 71 NY2d at 785 [holding that the courts' interpretative task "is not furthered by rote ascription of technical meanings to terms regardless of context"]; Matter of Kosek, 31 NY2d 475, 484-485 [1973] [in determining the meaning of a particular testamentary provision, the Court noted that there "is no more likely way to misapprehend the meaning of language . . . than to read the words literally, forgetting the object which the document as a whole seeks to achieve"] [internal quotation marks and citations omitted]). "Since the [decedent's] dominant intent [is] inferable from the [will] itself, its fulfilment constitutes no redrafting" (Matter of Fabbri, 2 NY2d at 242). Rather, reading the will as a whole and in light of the facts and circumstances surrounding its creation (see id. at 240; Matter of Scale, 38 AD3d at 986; Matter

of McCabe, 269 AD2d at 728) – and mindful of the general precept that no contest clauses, although valid, are disfavored and should be narrowly construed – we cannot conclude that decedent intended to preclude petitioners from seeking letters of administration in the face of the named fiduciaries' inaction.

Further, even if decedent's intent were to prohibit a beneficiary from questioning the conduct of a nominated fiduciary, such a broad no contest clause would be void as against public policy (see Matter of Rimland, 2003 NY Slip Op 50966[U], *5 [Sur Ct, Bronx County 2003]; Matter of Stralem, 181 Misc 2d at 718). EPTL 11-1.7 – the statutory provision addressing public policy as it pertains to will provisions – is designed "to curb the practice of insulating fiduciaries from an obligation to exercise reasonable care, diligence and prudence by making it against public policy" (Matter of Stralem, 181 Misc 2d at 720; see 4th Rep of Temp St Commn on Estates, 1965 NY Leg Doc No. 19, at 499; Margaret Valentine Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 11-1.7 at 144; Matter of Lang, 60 Misc 2d 232, 234-235 [1969]). A no context clause that attempts to preclude a beneficiary from questioning the eligibility or conduct of a fiduciary does just that, and is therefore contrary to public policy (see Matter of Egerer, 30 Misc 3d 1229[A], 2006 NY Slip Op 52713[U], *3 [Sur Ct, Suffolk County 2006]; Matter of Fromartz, 2005 NY Misc LEXIS 4654, *2 [2005]; Matter of Rimland, 2003 NY Slip Op 50966[U], at *5; Matter of Stralem, 181 Misc 2d at 720; Matter of Ascher, 175 Misc 943, 944-945 [1941]; Matter of Robbins, 144 Misc 2d 510, 514-515 [1989]; Matter of Lang, 60 Misc 2d at 235l; see also 12-207 Warren's Heaton on Surrogate's Court Practice § 207.01).

The dissent agrees that such a clause is void, but only to the extent that it bars challenges based upon probable cause. However, there is no basis in either the EPTL or this state's jurisprudence for imposition of such a requirement. The EPTL clearly and unequivocally sets forth a blanket prohibition against any attempt to exonerate a fiduciary from his or her obligation to exercise reasonable care, diligence and prudence, and – with one narrow exception not relevant here – expressly provides that the presence or absence of probable cause is not relevant to the validity of a no contest clause (see EPTL 3-3.5

[b]; 11-1.7).[3]

In sum, petitioners did not forfeit their interests under the 2011 will by seeking letters of administration. To the extent not specifically addressed herein, Neil Prevratil's remaining ascriptions of error have been reviewed and found to be lacking in merit.

Lahtinen and Garry, JJ., concur.


McCarthy, J. (concurring in part and dissenting in part).

I agree with the majority's resolution of this matter on all issues except the no contest clause in the 2011 will. Petitioners Sonya J. Stack and Rebecca L. Adrian (hereinafter collectively referred to as petitioners) violated that clause. On that basis, I respectfully partially dissent.

"There is no basis to disregard express terms in a will, absent ambiguity" (Matter of Clark, 304 AD2d 1034, 1034 [2003] [citation omitted]). "The paramount consideration in will construction proceedings is the testator's intent" (Matter of Singer, 13 NY3d 447, 451 [2009] [citation omitted]), and "'[w]here language is unambiguous and supports a reasonable meaning, it must be accepted as manifesting the grantor's

_____

[3]  The probable cause standard proffered by the dissent comes from the Restatement of Property, which, as noted, has not been adopted in this state (see Restatement [Second] of Property § 9.2). In that regard, the Restatement provides that "[a] beneficiary who in good faith questions in a legal proceeding the conduct of the fiduciary should presumptively be deemed to have probable cause" (Restatement [Second] of Property § 9.2 Comment c). Thus, even if this were the appropriate standard to be applied, we would find that the evidence submitted by petitioners was more than sufficient to demonstrate a good faith basis for questioning the conduct of the nominated and successor executor. In response, not a scintilla of evidence was presented to contradict petitioners' proof or otherwise rebut their showing.

intention; the court is bound and the canons of construction do not come into play'" (id., quoting Matter of Gouraud, 85 AD2d 342, 344 [1982], affd 59 NY2d 925 [1983]; accord Matter of Rodrigues, 33 AD3d 926, 927 [2006]).  The separate rule that we strictly construe no contest clauses (see Matter of Singer, 13 NY3d 447, 451 [2009]; Matter of Fairbairn, 46 AD3d 973, 974 [2007], lv denied 10 NY3d 708 [2008]) does not allow this Court to disregard a "testator's expressed intent" as manifested in such a clause, as long as the remainder of the will does not render that clause ambiguous (Matter of Singer, 13 NY3d at 454 [Graffeo, J., concurring]; see e.g. Matter of Fairbairn, 46 AD3d at 974).  The majority is correct that a will must be read as a whole, rather than parsing individual words or phrases out of context, to discern the testator's intent from the meaning of the words used in that instrument (see Matter of Bieley, 91 NY2d 520, 525 [1998]).  The majority only discerns a single dominant dispositional scheme and uses it to interpret every portion of the will so as to carry out that scheme.  In doing so, however, the majority ignores the possibility – and here, the fact – that a testator may plainly include alternative or contingent dispositional schemes in a will.

        The no contest clause included in decedent's will unambiguously forbids the action taken by petitioners.  As the movants for summary judgment dismissing Neil Prevratil's objection that petitioners should not benefit under the will because they had violated the no contest clause, petitioners had the burden of establishing, as a matter of law, either that they did not violate the no contest clause in the will or that any portion of the clause that they violated was void as against public policy (see generally Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Matter of Siegel, 90 AD3d 937, 939-940 [2011]).  The no contest clause in the 2011 will states, in part:

                "If any beneficiary hereunder shall
                contest . . . any provision [of this
                will], or shall institute or join in . . .
                any proceeding . . . to prevent any
                provision [of the will] from being carried
                out in accordance with its terms
                (regardless of whether or not such

proceedings are instituted in good faith
and with probable cause), then all
benefits provided for such beneficiary are
revoked."

This portion of the clause goes further than a more general
prohibition to contesting probate or attacking the validity of
the will, as it unambiguously expresses the intent to further
prohibit beneficiaries from contesting any individual provision
of the will or from joining in "any proceeding . . . to prevent
any provision [of the will] from being carried out in accordance
with its terms" (compare Matter of Rimland, 2003 NY Slip Op
50966[U], *3-4 [2003] and Matter of Stralem, 181 Misc 2d 715, 717
[1999], with Matter of Singer, 13 NY3d at 454 and Matter of
Fairbairn, 46 AD3d at 974).

Turning to the other provisions of the will, one nominates
petitioner Frank A. Prevratil as executor of decedent's estate
and Sheri Prevratil as successor executor.[1]  Upon the motion made
by petitioners and Charles Prevratil (hereinafter collectively
referred to as the proponents) for summary judgment dismissing
Neil Prevratil's objections, the proponents submitted evidence
that petitioners had cross-petitioned for probate of the 2011
will and had sought issuance of letters c.t.a. to themselves,[2]

[1]  Our courts have regularly recognized the importance of a
testator's choice of executor, acknowledging that it "should be
given great deference and not disregarded unless that executor is
not legally qualified to act as a fiduciary" (Matter of Palma, 40
AD3d 1157, 1158 [2007]; see Matter of Venezia, 25 AD3d 717, 718
[2006]; Matter of Hunter, 6 AD3d 117, 127 [2004], affd 4 NY3d 260
[2005]; see also Matter of Leland, 219 NY 387, 393-394 [1916]).
Any sympathetic reading of the will for the primary purpose of
giving effect to decedent's intent requires such deference to
decedent's unambiguous preference of executors.  The majority's
decision gives no weight to decedent's intent in this regard.

[2]  Petitioners' attempt to probate the 2011 will did not
require them to address the issue of who should administer
decedent's estate.  As the majority decision illustrates, a court

alleging in a sworn statement that the nominated executor and successor executor were unfit to administer the estate because they had not yet sought to probate the will and had refused to return petitioners' phone calls.  Having joined in a proceeding in which one of the express purposes was to have the nominated executors disqualified, petitioners both contested the nomination provision of the will and attempted "to prevent [that] provision [in the will] from being carried out in accordance with its terms."

A reading of the remainder of the will does not alter this result, because the entirety of the will does not render the meaning of the relevant portions of the no contest clause ambiguous.  The majority opines that "[q]uite obviously, what decedent desired was that the entirety of his estate be distributed equally to, and remain with, the proponents." However, as a matter of necessity, every will that contains a no contest clause that has the potential to deny benefits to an individual must also contain other provisions making that individual a beneficiary.[3]  This scenario on its own does not create any ambiguity as to a dominant dispositional scheme, as it is reasonably interpreted as conveying contingent rather than conflicting intentions (see Matter of Ragone, 116 Misc 2d 993,

_____

may probate a will without also determining who should administer the estate (see SCPA 1402 [1] [a]; see also Margaret Valentine Turano, Practice Commentaries, McKinney's Cons Laws of NY, Book 58A, SCPA 1402, at 185 [stating that "(t)his section confers status to petition for the probate of a will.  It does not confer any right to serve as fiduciary, but simply to offer the will for probate so the court can appoint the person nominated in the will or other appropriate fiduciary"]).

[3]  For this reason, the majority's emphasis that "the will expressly 'made no [dispositional] provision[]' for either Neil Prevratil or Frank A. Prevratil" only draws further attention to the fact that those individuals were not the intended subjects of the prohibitions of the no contest clause.  If that provision has any other relevance, it supports the argument that decedent cared a great deal about his power to withhold gifts from individuals.

998-999 [1981] [finding that the existence of a residuary clause does not create an ambiguity as to a testator's intended dispositional scheme where that clause was reasonably interpreted as only applying in the contingent scenario where other provisions of the will did not dispose of the entirety of the estate in some alternative manner], mod 87 AD2d 457 [1982], revd 58 NY2d 864, 866 [1983] [reversing the Appellate Division and affirming Surrogate's Court "for reasons stated" in Surrogate's Court's decision]).  In addition, a reading of the entirety of the will only reinforces that decedent intended for the prohibitions described in the no contest clause to apply to "any beneficiaries," including petitioners.  Absent the scenarios described in the no contest clause, and as the majority notes, decedent intended to distribute the entirety of his estate between three people, two of whom are petitioners.  Had decedent intended to apply the no contest clause only to Charles Prevratil, the third beneficiary, decedent could have easily named him rather than describing the clause as applying to "any beneficiary."  Further, the rest of the will does not contain any language that could reasonably be read as addressing the scenarios described in the no contest clause.  Therefore, petitioners' actions violated the no contest clause according to its plain language.[4]

_____

    [4]  This conclusion — that decedent intended to protect his nominated executors from attacks against their fitness to serve in such a position — is not so unreasonable that no decedent would have intended it, which might warrant disregarding the plain meaning of the relevant provisions (see generally Matter of Estate of Clark, 304 AD2d at 1034).  This state's courts have repeatedly faced testators who have unambiguously attempted to exempt nominated fiduciaries from the requirements otherwise placed on them by law (see e.g. Matter of Allister, 144 Misc 2d 994, 997-998 [1989]; Matter of Robbins 144 Misc 2d at 512-515; Matter of Lang, 60 Misc 2d 232, 233-234 [1969]), testators have previously attempted to insulate their nominated executors from challenge to their service as fiduciaries (see e.g. Estate of Ferber, 66 Cal App 4th 244, 248 [Cal App 1998] [examining a no contest clause that denied benefits to any beneficiary who "challenge(d) the appointment of any person named as an

The majority never states that any portion of the will renders the plain language of the no contest clause ambiguous. Instead, the majority notes that this Court has a duty to avoid "isolated and overly literal reading[s]" that reduce interpretation to "a simple exercise in semantics," because such readings risk misinterpreting a testator's intent (internal quotation marks and citation omitted). A reading based on the plain language of the no contest clause is isolated by necessity rather than design, because the will does not otherwise address the actions that were prohibited by the no contest clause or, alternatively, suggest that petitioners might not be subject to that clause. The reading is literal to the extent that it gives effect to plain language[5] and semantic to the extent that it affords each of the quoted portions of the no contest clause its single reasonable meaning. Disregarding the plain and literal meaning of such language when discerning intent, as the majority appears to do, renders the plain language of the no contest clause meaningless.[6] In the search for a testator's intent, "[w]ords are never to be rejected as meaningless or repugnant if . . . they may be made consistent and significant. Excision is a 'desperate remedy'" (Matter of Buechner, 226 NY 440, 443 [1919,

---

executor"]), and commentators have specifically addressed that scenario (see Restatement [Second] of Property § 9.2 Comment c).

[5] It is difficult to imagine a workable standard that would give a testator meaningful guidance for how to employ appropriately literal language, rather than overly literal language, the latter of which the majority does not recognize as conveying a testator's intention.

[6] An alternative possible interpretation of the majority's conclusion is that rather than finding that the relevant portions of the no contest clause should be attributed no meaning, their broad and plain language application should instead be narrowed. The record would provide no rational basis to assert that decedent intended to provide a particular and more narrow no contest clause, and this Court's insertion of its own wisdom as to the proper scope of such clauses would in no way properly further the search for decedent's intent regarding the matter.

Cardozo, J.] [citation omitted]; accord Matter of Gulbenkian, 9 NY2d 363, 370 [1961]).  Because the no contest clause is reconcilable with the remaining language of the will under a dominant scheme that provides for different dispositions upon different contingent events, there is no authority that would support a construction that, in an effort to discern decedent's intent, excises the literal and plain language portions of the no contest clause as meaningless.

Turning now to the issue of public policy, petitioners failed to establish that, as a matter of law, any portion of the no contest clause that they violated is contrary to public policy.  Statutory eligibility requirements for the fiduciary of an estate limit a testator's choice of executor (see SCPA 707).  In light of these statutory eligibility requirements, I do not believe that public policy allows testators to entirely prohibit beneficiaries from bringing the ineligibility of nominated executors to the attention of the courts, which would frustrate the ability of those courts to conduct independent inquiries into such a matter (see generally Estate of Ferber, 66 Cal App 4th 244, 254 [Cal App 1998] [noting that even though courts have a duty of oversight as to the administration of an estate, "as a practical matter, (they) lack the resources to scrutinize every matter . . . (and) must rely on beneficiaries to be aware of the facts and raise cogent points"]).

Public policy as to the fitness of a nominated executor is not entirely analogous to that expressed in EPTL 11-1.7.  As the majority notes, EPTL 11-1.7 establishes that, generally, public policy contravenes "[t]he attempted grant to an executor . . . [of] exoneration . . . from liability for failure to exercise reasonable care, diligence and prudence."  First, EPTL 11-1.7 deals with executors who have fiduciary duties; someone who is merely nominated as executor does not have the duties mentioned in EPTL 11-1.7 (see generally Matter of Mandelbaum, 7 Misc 3d 539, 540 [2005]).  Among other reasons that a nominated executor does not have such duties is that he or she may have no notice of the potential appointment or, alternatively, of a testator's death (compare SCPA 1414 [1], [4]), and further, it would be unreasonable to attribute to a nominated executor the duties of a fiduciary without also distributing the corresponding powers.

Not only is there a meaningful difference between executors and nominated executors but, for the purposes of the testator's choice of executor, breach of duty claims are not like unfitness claims. While "it is not every breach of fiduciary duty that will warrant removal [of an executor]" (Matter of Duke, 87 NY2d 465, 473 [1996] [internal quotation marks and citations omitted]), every finding of unfitness renders a nominated executor ineligible (see SCPA 707). The former can simply be an attack on a fiduciary's execution of his or her duties, or can even seek to encourage the fiduciary to continue serving, although in a more diligent and conscientious manner, but the latter is necessarily a direct attempt to undermine the testator's choice of executor.

Public policy does not weigh entirely in favor of questioning a testator's choice of executor. While statutory eligibility requirements exist, "[i]t may be broadly stated that the common law favors the rule that no restriction should be placed upon the choice of an executor" (Matter of Leland, 219 NY 387, 393-394 [1916], supra; cf. Matter of Duke, 87 NY2d at 473 ["Removal of a fiduciary constitutes a judicial nullification of the testator's choice and may only be decreed when the grounds set forth in the relevant statutes have been clearly established."]). Therefore, public policy in this situation requires a balance between the goals of allowing proper inquiries into a nominated executor's eligibility while dissuading unwarranted and costly second-guessing of a testator's choice of executor. This proper balance requires that beneficiaries be allowed to argue to courts that nominated executors are ineligible, regardless of testators' intentions to the contrary, but only to the extent that such contest is based on probable cause (cf. EPTL 11-1.7, 3-3.5 [b] [1]; see generally Matter of Singer, 13 NY3d at 452 [acknowledging that the statutory protections from no contest clauses provided in EPTL 3-3.5 are "not exclusive"]; Restatement [Second] of Property § 9.2 Comment c).[7] Accordingly, the specific portion of the no contest clause

_____

[7] I note that while a more far-reaching public policy protection for ineligibility claims made in good faith would also seem reasonable in striking the appropriate balance (see

here that seeks to withhold benefits from any beneficiary who, upon probable cause, attempts to replace the nominated executors due to their ineligibility is without effect.

Turning to the motion, petitioners signed a sworn statement that Frank A. Prevratil and Sheri Prevratil were both unfit to serve as executor of decedent's estate because the nominated executors "[were] aware of the [w]ill dated May 24, 2011 executed by [d]ecedent before his death but ha[d] chosen not to file said [w]ill for probate with the [c]ourt and ha[d] refused to return telephone calls by [p]etitioners to them."[8]  On a motion for summary judgment, the evidence must be viewed in a light most favorable to the nonmoving party, according him or her the benefit of every reasonable inference (see William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh, 22 NY3d 470, 475 [2013]; McGrath v George Weston Bakeries, Inc., 117 AD3d 1303, 1305 [2014]).  Under this standard of review, the evidence submitted was insufficient to establish as a matter of law that petitioners had probable cause to allege that Frank A. Prevratil and Sheri Prevratil were both "unfit for the execution of the office" at the time that petitioners requested letters c.t.a. for themselves (SCPA 707 [1] [e]; see Matter of Badore, 73 Misc 2d 471, 474 [1973]).  The evidence makes no distinction between the two nominated executors and gives no factual support for petitioners' conclusions that they had chosen not to file the will.  There is a reasonable possibility that such conclusions were speculative.  Even if the conclusions were supported, petitioners submitted no evidence that established, as a matter of law, that the circumstances of such a choice not to probate the 2011 will would render both nominated executors unfit.

---

Restatement [Second] of Property § 9.2 Comment c), there appears to be no precedent in this state's jurisprudence or statutes that would support such a protection from the reach of a no contest clause.

[8]  Although petitioners also submitted portions of each of their sworn testimony, that testimony and their other submissions are unrelated to the fitness of the nominated executors.

Accordingly, because petitioners failed to meet their prima facie
burden, I would deny summary judgment on the fourth objection
(see generally Matter of Siegel, 90 AD3d 937, 940 [2011], supra)
and would remit for the parties and Surrogate's Court to address
the issue of probable cause.

ORDERED that the order is affirmed, without costs, and
decedent's May 24, 2011 will is admitted to probate.

ENTER:

Robert D. Mayberger
Clerk of the Court